966 P.2d 23

**Robert L. BILOW, Plaintiff–Respondent–Cross Appellant,**

v.

**PRECO, INC., an Idaho Corporation, Defendant–Appellant–Cross Respondent.**

No. 23737.

Supreme Court of Idaho, Twin Falls, March 1998 Term.

Sept. 8, 1998.

Rehearing Denied Nov. 3, 1998.

Holland & Hart and Eberle, Berlin, Kading, Turnbow & McKlveen, Boise, for appellant. Steven B. Anderson argued.

Hepworth, Lezamiz & Hohnhorst, Boise, for respondent. John C. Hohnhorst argued.

**SCHROEDER, Justice.**

This is an appeal from the district court's grant of summary judgment in favor of Robert Bilow (Bilow) against Preco, Inc. (Preco). The district court held that sums of deferred incentive compensation payable to Bilow pursuant to an employment contract were (1) "wages" pursuant to section 45–601(4) of the Idaho Code (I.C.), and (2) the Employment Retirement Income Security Act did not preempt Bilow's claim of treble damages. Bilow has cross-appealed the district court's denial of attorney fees.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

In 1983 Bilow became the president of Santa Clara Plastics, a division of Preco. On August 11, 1988, he executed an employment agreement with Preco to take effect on December 31, 1988. Under the agreement Bilow received base compensation of $150,000 per year, paid weekly, and "incentive compensation"[1] of 6.25% of Preco's monthly "pre-tax profit" as defined in the agreement. Preco paid out 20% of the 6.25% each month (or 1.25% of Preco's monthly "pre-tax profit") as a "current incentive compensation payment" for that month. The remaining 80% (or 5% of Preco's "pre-tax profit") was allocated to a deferral account. The amount

---

1. The portion of the agreement explaining the incentive compensation stated as follows:

 The term "pre-tax profit" shall mean the total of the following items:
 (1) Net income or loss per books of Preco before taxes and before accrual or payment of incentive compensation to Bilow v. Jack Y. Robertson pursuant to their Employment Agreements with Preco;
 (2) Total monies paid or allocated by, to or for the benefit of Edwin R. Peterson;
 (3) The total non-commercial aircraft expense of Preco; and
 (4) The amounts entered on the books of Preco to reflect the vesting of the "deferral account" pursuant to Section 5 and any depreciation or amortization resulting from "push down accounting" related to Preco's repurchase of the shares held by Edwin R. Peterson.
 During each month of this Agreement, 1.25% of Preco's "pre-tax profit" for that month (whether positive or negative) shall be allocated to the current incentive compensation payment for that month, and 5% of Preco's "pre-tax prof-

it" (whether positive or negative) shall be allocated to a "deferral account" for 48 equal monthly payments to Bilow to begin in January of the following year.
 During each month of this Agreement, Bilow shall be paid any positive total of the following positive and/or negative amounts: (a) 1.25% of that month's "pre-tax profit," and (b) the amounts previously allocated to the "deferral account" for that month from "pre-tax profits" of the prior four (4) years. The effect of such calculation should be to offset a negative "pre-tax profit" for any month by the positive amount from the "deferral account," but Bilow will not pay Preco any negative total of such calculation.
 In order to implement the incentive compensation program for the years 1989 through 1992, amounts shall be allocated to the "deferral account" as if allocations had been made to it since January 1, 1985. At the commencement of the program on January 1, 1989, the Bilow "deferral account" consisted of the total of $85,442 for 1985, $97,933 for 1986, $207,056 for 1987, and $463,638 for 1988.

allocated to the deferral account was to be paid to Bilow over a rolling four-year period, with 1/48th of the account balance being paid each month, beginning in January of 1990.[2] The purpose of the incentive compensation plan was to average Bilow's income over a four-year period.

Under the 1988 agreement, if Bilow had died or voluntarily terminated his employment, he would have forfeited the amount allocated to the deferral account. If Preco terminated Bilow's employment at any time in 1989, he was to receive a cash settlement equal to 150% of the balance of the deferral account, adjusted to present value at a 6% discount rate. If Preco terminated Bilow's employment on or after January 1, 1990, he was to receive a cash settlement equal to the balance of the deferral account calculated as of the date of termination and adjusted using the same discount factor. If Bilow were disabled, he was to receive 50% of the balance of the deferral account (later amended to 100%) payable monthly during the four-year deferral term.

On June 29, 1990, the parties executed an agreement entitled "Amended and Restated Employment Agreement." The relevant changes to the 1988 agreement were: (1) Bilow would forfeit the accrued amount in the deferral account if he resigned before July 1, 1995, but if he terminated his employment with Preco on or after that date he would be entitled to the full deferral account balance, paid over as if his employment had continued; (2) if Bilow died, regardless of the date, his estate would receive the amount allocated to the deferral account, paid over four years as if his employment had continued; and (3) Preco agreed not to terminate Bilow's employment before July 1, 1995, except for "extreme misconduct," but if Preco terminated Bilow's employment at any time, he was entitled to a cash settlement equal to the balance of the deferral account, calculat-

ed as of the date of termination and adjusted to present value at a 6% discount rate.

Early in 1995 the parties agreed that Bilow would leave his employment with Preco and negotiated an agreement that his resignation would be treated as occurring on July 1, 1995, which meant that he would be entitled to receive the balance accrued in the deferral account as of July 1, 1995, payable ninety days thereafter. He had the option to receive the account balance in a discounted lump sum or paid out as if his employment continued. Bilow informed Preco that he wished to receive the account balance in a lump sum.

On July 27, 1995, Preco advised Bilow that the account balance as of July 1, 1995, was $1,644,295 and stated that this amount would be paid, with some possible adjustments, on September 29, 1995. Bilow disagreed with Preco's calculation of the account balance, and the parties began an exchange of documents in an attempt to determine the proper amount of payout. On September 29, 1995, Preco informed Bilow that it would only pay him if he executed a release of all present and future claims he had against Preco. Bilow refused. Preco made no payment on September 29, 1995.

In December of 1995, Bilow requested that Preco pay him $1.5 million and that the parties then try to amicably resolve the dispute over a possible remainder due. Preco refused this offer by way of a letter in January 1996 and stated that the July 1995 figure which they had quoted was incorrect. Preco asserted that the properly calculated deferral account balance was $1,127,449 and stated that nothing would be paid to Bilow until the parties came to an agreement regarding the entire amount owed. Bilow filed suit in February 1996, seeking $2,334,778 in damages, trebled to $7,004,334, pursuant to I.C. § 45-

2. The agreement explained a monthly payout in the following fashion:

For example, in the event that Bilow has been an employee of Preco pursuant to this Agreement through the month of January of 1990, Bilow shall be paid as incentive compensation for the month of January 1990 any positive total of the following positive and/or negative amounts: (a) 1.25% of the January 1990 Preco "pre-tax prof-

it," (b) 1/48th of 5% of the 1989 Preco "pre-tax profit" from the Bilow "deferral account," (c) 1/48th of 5% of the 1988 Preco "pre-tax profit" from the Bilow "deferral account," (d) 1/48th of 5% of the 1987 Preco "pre-tax profit" from the Bilow "deferral account," and (e) 1/48th of 5% of the 1986 Preco "pre-tax profit" from the Bilow "deferral account."

617(4), plus interest and attorney fees. On August 19, 1996, Preco paid Bilow $1,733,-068.71, without requiring or obtaining any form of release.

Bilow moved for partial summary judgment, asserting that the amount due and owing him was "wages" as that term is defined in I.C. § 45–601(4), and that he was entitled to treble damages under I.C. § 45–617(4). Preco filed a cross motion for partial summary judgment, arguing that the Employee Retirement Income Security Act of 1974 (ERISA) preempted Bilow's state law claim for treble damages. Preco also contended that Bilow's claim was not one for wages. The district court granted summary judgment in favor of Bilow. Preco appeals. Bilow cross-appeals the denial of attorney fees.

## II.

## STANDARD OF REVIEW

This Court applies the same standard of review as that used by the district court when originally ruling on a motion for summary judgment. *Avila v. Wahlquist*, 126 Idaho 745, 747, 890 P.2d 331, 333 (1995); *Farm Credit Bank of Spokane v. Stevenson*, 125 Idaho 270, 272, 869 P.2d 1365, 1367 (1994). The Court must liberally construe the facts in the existing record in favor of the nonmoving party and draw all reasonable inferences from the record in favor of the nonmoving party. *Avila*, 126 Idaho at 747, 890 P.2d at 333; *Bonz v. Sudweeks*, 119 Idaho 539, 541, 808 P.2d 876, 878 (1991). Summary judgment is appropriate " 'if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *McCoy v. Lyons*, 120 Idaho 765, 769, 820 P.2d 360, 364 (1991) (quoting I.R.C.P. 56(c)). If there are conflicting inferences contained in the record or reasonable minds might reach different conclusions, summary judgment must be denied. *Bonz*, 119 Idaho at 541, 808 P.2d at 878.

## III.

## THE DISTRICT COURT DID NOT ERR IN REFUSING TO CONSIDER EXTRINSIC EVIDENCE IN ORDER TO CLARIFY THE INTENT OF THE PARTIES.

Preco contends that the district court should have considered the following extrinsic evidence to determine the intent of the parties to the agreements: (1) a letter from Bilow to his divorce attorney which explained his employment agreement with Preco, (2) the affidavit of Preco's chief financial officer, Anthony Oliveri, which explained how the incentive compensation was calculated, and (3) the affidavit of Mark Peterson, a member of the Board of Directors at Preco describing the discussions and negotiations between Bilow and Preco which occurred prior to the formation of the 1988 agreement.

### A. The Bilow Letter and the Affidavit of Anthony Oliveri

The court's objective in constructing a contract is to ascertain and give effect to the intent of the parties. *George v. University of Idaho*, 121 Idaho 30, 35, 822 P.2d 549, 554 (Ct.App.1991). "If the contract is clear and unambiguous, the court gives effect to the language employed according to its ordinary meaning." *Dille v. Doerr Distributing Co.*, 125 Idaho 123, 125, 867 P.2d 997, 999 (Ct.App.1993). In construing unambiguous terms of a contract, the court ascertains the parties' intent from the language contained in the contract. *George*, 121 Idaho at 35, 822 P.2d at 554. If the contract is ambiguous, extrinsic evidence may be considered to discern the true intent of the parties. *Dille*, 125 Idaho at 125, 867 P.2d at 999; *International Eng'g Co. v. Daum Indus., Inc.*, 102 Idaho 363, 365, 630 P.2d 155, 157 (1981). Therefore, unless the employment agreement is ambiguous, it is improper to consider extrinsic evidence.

"Whether a contract is ambiguous is a question of law, and this court is not bound by the decision of the trial court, but is free to draw its own conclusions from the evidence." *Dille*, 125 Idaho at 125, 867 P.2d at 999 (citing *Clark v. St. Paul Property & Liab. Ins. Cos.*, 102 Idaho 756, 757, 639 P.2d 454, 455 (1981)). " 'A contract is ambiguous

if it is reasonably subject to conflicting interpretations.'" *Dille,* 125 Idaho at 126, 867 P.2d at 1000 (quoting *Murr v. Selag Corp.,* 113 Idaho 773, 781, 747 P.2d 1302, 1310 (Ct. App.1987)). Preco has stated that the contact in this case is unambiguous. Counsel for Preco made this clear during the hearing on the cross-motions for summary judgment:

As to the affidavit there is one point that we need to clear up on the parol evidence rule. Our position and what was stated in the response to the motion to strike where they said Preco had not agreed that the contract is ambiguous. Unfortunately, that's a typo. What we meant to say is they have not argued that the agreement is ambiguous. If you take it in context that is what we're saying, because we think the contract is clear. And we've argued that all along. . . .

Furthermore, Preco has not asserted on appeal that the contract is ambiguous. Therefore, both the letter and the affidavit of Anthony Oliveri are inadmissible to discern the intent of the parties.

**B. The Affidavit of Mark Peterson**

 Preco also argues that the court should have considered the affidavit of Mark Peterson. However, the negotiations that occurred prior to the formation of the 1988 agreement constitute parol evidence. Parol evidence is "any . . . written or oral agreements or understandings . . . made prior to or contemporaneously with the written 'contract.'" *Chapman v. Haney Seed Co.,* 102 Idaho 26, 28, 624 P.2d 408, 410 (1981). If the language of a contract is plain and unambiguous the intention of the parties must be determined from the contract itself, and parol evidence will not be admissible to show intent. *See McCoy v. McCoy,* 125 Idaho 199, 204, 868 P.2d 527, 532 (Ct.App.1994). Preco did not argue that the employment agreement was ambiguous. Therefore, the affidavit of Mark Peterson is inadmissible.

## IV.

**THE DISTRICT COURT DID NOT ERR IN ITS DECISION THAT THE DEFERRAL ACCOUNT CONSTITUTES WAGES UNDER I.C. § 45–601(4).**

 Idaho Code § 45–601(4) defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece or commission basis." Idaho courts have held that a bonus or a commission is a "wage" as contemplated by I.C. § 45–601(4). *Goff v. H.J.H. Co.,* 95 Idaho 837, 840, 521 P.2d 661, 664 (1974); *Neal v. Idaho Forest Indus., Inc.,* 107 Idaho 681, 683, 691 P.2d 1296, 1298 (Ct.App.1984). Bilow argues that the deferral account was a bonus and, therefore, meets the definition of "wages."

Preco maintains that the deferral account is similar to the cash value of a life insurance policy, which the Idaho Court of Appeals has held does not meet the definition of "wages." *Whitlock v. Haney Seed Co.,* 114 Idaho 628, 634, 759 P.2d 919, 925 (Ct.App.1988). The Court of Appeals held:

We do not believe [the] language [of I.C. § 45–601(4) ] encompasses the cash value of a life insurance policy payable to an employee where, as here, the proceeds of the policy were to be paid to the employee at retirement or to his heirs upon his death. The policy is a fixed benefit of employment status. As such, it is compensatory in a generic sense; but it is not compensation earned in increments as services are performed. In this respect it is unlike wages. It is also unlike compensation paid in direct consideration of services rendered, in amounts over and above an employee's regular "paychecks."

*Id.* at 634–35, 759 P.2d at 925–26. Preco takes the position that the amount in the deferral account is similar to the cash value of a life insurance policy because the account is a "fixed benefit of employment status." The district court, however, distinguished the deferral account from a life insurance policy:

Bilow earned, as payment for services rendered over the course of seven years, the balance of the funds in the deferral account. They were part and parcel of his incentive compensation agreement, and were paid out over a rolling four year period. These funds represent compensation paid in direct consideration of services rendered, over and above Bilow's "regular

paychecks" rather than "a fixed benefit of employment status," as Preco argues. Unlike the cash value of the insurance policy, the funds in the deferral account were constantly being paid out to Bilow and replenished. The account cannot be said to be a "fixed benefit of employment status."

Preco contends that the district court misconstrued the term "fixed," as the court used it in *Whitlock*, to mean that the *amount* of the benefit must be "fixed" in order to be a "fixed benefit of employment status." Preco maintains that the term "fixed" means that the entitlement to the benefit was "fixed" in the sense that it was vested.

Even if the Court in *Whitlock* used the term "fixed" to mean "vested," the district court's analysis focused on the fact that the deferral account differs from a life insurance policy because funds from the deferral account were paid to Bilow every month. The beneficiaries of a life insurance policy do not have the right to receive benefits until the death of the policy holder. Bilow was entitled to the funds of the deferral account upon the happening of certain events—termination, death or disability—Bilow was still entitled to the funds even if those events did not occur. According to the employment agreement, "during each month of this Agreement, Bilow shall be paid ... the amounts previously allocated to the 'deferral account' for that month from 'pre-tax profits' of the prior four (4) years."

Preco also relies on *Johnson v. Allied Stores Corp.*, 106 Idaho 363, 679 P.2d 640 (1984), to establish that the amount in the deferral account did not constitute "wages." In *Johnson*, the Court interpreted I.C. § 45–608 ·(now I.C. § 45–614), a wage collection statute which contains two periods of limitations, to determine which limitation period applies in an action to collect severance pay. The former version of I.C. § 45–608 provided:

> Any person shall have the right to collect salary, wages, overtime compensation, penalties and liquidated damages provided by any law or pursuant to a contract of employment, but any action thereon shall be commenced in a court of competent juris-diction within two (2) years after the cause of action shall have accrued, provided, however, that in the event salary or wages have been paid to any employee and such employee claims additional salary, wages, overtime compensation, penalties or liquidated damages, because of work done or services performed during his employment for the *pay period* covered by said payment, any action therefor shall be commenced within six (6) months from the accrual of the cause of action.

*Johnson*, 106 Idaho at 367, 679 P.2d at 644 (quoting I.C. § 45–608) (emphasis added). The Court held that the two-year period of limitation applied "[b]ecause severance pay is not attributed to, or earned in a specific pay period, but, is earned over the entire course of the employment relationship." *Id.* The six-month period is inapplicable to a claim for severance pay because it "refers to a claim for additional salary for a *specific pay period* from which an employee has already received some payment of salary or wages." *Id.*

Wages, as defined by *Whitlock*, constitute "compensation earned in increments as services are performed." *Whitlock*, 114 Idaho at 634, 759 P.2d at 925. According to Preco, since the district court characterized the deferral account as "payment for services rendered over the course of seven years," it is severance pay, rather than a wage. Bilow did earn payment for services rendered over the course of seven years. However, as noted by the district court, "the funds in the deferral account were constantly being paid out to Bilow and replenished." As the employment agreement stated, *each month* Bilow earned 6.25% of Preco's pre-tax profit.

Finally, Preco relies on *Latham v. Haney Seed Co.*, 119 Idaho 412, 807 P.2d 630 (1991), to support its contention that the amount in the deferral account does not constitute "wages." In *Latham*, an employee sought to recover treble the value of a life insurance policy that his employer failed to transfer at the time of his termination. The issue was not whether the life insurance policy constituted "wages," but whether the claim was barred by the two-year statute of limitations under I.C. § 45–608. The Court held that at the time the employee filed the action, the

definition of wages under I.C. § 45–609(3) (now I.C. § 45–601(4)) "did not apply to I.C. § 45–608." *Id.* at 414, 807 P.2d at 632. As a result, the Court's decision was not controlled by I.C. § 45–601(4). The Court in *Latham* distinguished *Whitlock,* which was controlled by I.C. § 45–601(4), and in doing so, stated that "[t]he rationale of the Court of Appeals in holding that the benefits of the life insurance policy that were at issue in *Whitlock* were not 'wages' was that it was not '*compensation earned in increments as services are performed.*'" *Id.* at 415, 807 P.2d at 633 (emphasis added).

The deferral account in this case was "compensation earned in increments as services are performed." The portion of the pre-tax profits that Bilow received each month was based upon past years performance, 5% of the current month's profits being deferred for payment as compensation in the years ahead using the same year averaging formula. Bilow had already earned the money in the deferral account. Furthermore, he earned it in monthly increments.

Finally, the purpose of deferring the incentive compensation is explained in the employment agreement:

> During each month of this Agreement, Bilow shall be paid any positive total of the following positive and/or *negative* amounts: (a) 1. 25% of that month's pre-tax profit, and (b) the amounts previously allocated to the deferral account for that month from pre-tax profits of the prior four years. The effect of such calculation should be to offset a negative pre-tax profit for any month by the positive amount from the deferral account.

(Emphasis added). In other words, since it was possible that Preco could experience a negative pre-tax profit, Preco funded the deferral account with prior pre-tax profits to ensure that even if Preco did not profit during certain months, Bilow would still receive incentive compensation each month. The fact that there was a balance in the deferral account when Bilow terminated his employment does not mean that it was intended as retirement or similar post-employment benefits. Bilow had already earned that money. The timing of the payment does not change the character of the money paid. The deferral account constitutes wages as contemplated by I.C. § 45–601(4).

## V.

## THE EMPLOYMENT INCENTIVE AGREEMENT IS NOT WITHIN THE SCOPE OF ERISA.

■ Preco argues that the employment agreement is a "top hat" pension benefit plan under ERISA. ERISA contains a broad preemptive clause which states that it "shall supersede any and all State laws insofar as they … relate to any employee benefit plan." 29 U.S.C. § 1144(a). Idaho's Wage Act conflicts with ERISA. Therefore, if the agreement is within the scope of ERISA, I.C. § 45–617 is preempted and Bilow's wages are not subject to trebling.

An ERISA pension benefit plan is defined as:

> any plan, fund or program … established or maintained by an employer … to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program—
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, … or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A). In addition to meeting the requirements of an ERISA pension benefit plan, a top hat plan must also be "unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1). Bilow does not dispute that the incentive compensation agreement meets the requirements of a top hat plan.

Bilow argues, however, that the incentive compensation agreement is a bonus which is exempt from ERISA:

For purposes of title I of the Act and this chapter, the terms "employee pension benefit plan"and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment and beyond, or so as to provide retirement income to employees.

29 C.F.R. § 2510.3–2(c).

In *Hagel v. United Land Co.,* 759 F.Supp. 1199 (E.D.Va.1991), the court sought to determine whether an employment compensation plan was a bonus or a pension plan under ERISA. The plan at issue provided that the employee would receive a bonus based upon the net profits derived from development deals. The payments of the bonuses were spread out over five years. The court held that the agreement was outside the scope of ERISA because the "payments . . . were not systematically deferred. . . . They were, on the contrary, received by plaintiff during his employment. . . ." *Id.* at 1202. Bilow also received his payments during the course of his employment. The *Hagel* court explained that

> [a] more natural reading of § 1002(2)(A)(ii)'s requirement that there be a "deferral of income . . . to the termination of covered employment or beyond" is that the statute requires that a plan generally defer the receipt of income to the termination of employment. The statute is not satisfied when, under the facts of a particular case, a portion of withheld income happens to become due after termination.

*Id.* In this case, the purpose of the deferral account, as explained above, was to provide Bilow with income even when Preco did not produce a pre-tax profit for the month. The components of the agreement which provide that the deferral account would be payable in the event of retirement, termination, death or disability are incidental to the incentive compensation agreement. Therefore, the agreement was not within the scope of ERISA and is subject to trebling pursuant to I.C. § 45–617.

# VI.

## THE DISTRICT COURT DID NOT ERR IN REFUSING TO AWARD BILOW ATTORNEY FEES.

 Bilow contends he is entitled to attorney fees under I.C. § 45–617(4) which provides, in part, that "[a]ny judgment rendered by a court . . . for the plaintiff in a proceeding pursuant to this chapter shall include all costs and attorney fees reasonably incurred." The district court refused to grant Bilow attorney fees because he failed to file a demand for the fees as required by I.C. § 45–615.

 In *Barth v. Canyon County,* 128 Idaho 707, 918 P.2d 576 (1996), this Court noted that "Idaho Code § 45–615 requires an employee who seeks attorney fees in a suit for wages to make a demand 'for a sum not to exceed the amount so found due.'" *Id.* at 713, 918 P.2d at 582. Bilow argues that *Barth* is not controlling because the issue was not whether an employee *must* make a demand in order to recover attorney fees. While this is true, the Court held that the manner in which the employee made the demand "destroy[ed] the effect of the demand" and refused to award him attorney fees. *Id.* It is clear from *Barth,* therefore, that unless the employee has made a demand pursuant to I.C. § 45–615, attorney fees under I.C. § 45–617(4) are not available.

 Bilow also seeks attorney fees pursuant to I.C. § 12–120(3), arguing that I.C. § 45–615 does not provide the exclusive remedy for a party asserting a claim for unpaid wages. Bilow relies on *Property Management West, Inc. v. Hunt,* 126 Idaho 897, 894 P.2d 130 (1995) and *Atwood v. Western Constr., Inc.,* 129 Idaho 234, 923 P.2d 479 (Ct.App.1996), holding that I.C. § 12–120(3) applies in actions between employers and employees to recover contractual compensation. However, neither *Property Management* nor *Atwood* involved a claim for unpaid wages under Idaho's treble damage wage claim law.

The Idaho Court of Appeals specifically addressed the issue presented in *Hutchison*

*v. Anderson,* 130 Idaho 936, 950 P.2d 1275 (Ct.App.1997):

> Count one of [Hutchisons'] complaints is a breach of contract claim in which the Hutchisons claim a right to attorney fees pursuant to I.C. § 12–120. Count two of the complaints is a wage claim filed pursuant to I.C. § 45–617(4) in which the Hutchisons sought treble damages and attorney fees pursuant to I.C. § 45–615. The district court awarded the Hutchisons treble damages pursuant to I.C. § 45–617(4), but then, rather than awarding attorney fees under I.C. § 45–615 as was pled in count two, awarded attorney fees pursuant to I.C. § 12–120, which was the attorney fee requested in count one. The district court's decision to award treble damages indicates that the Hutchisons prevailed at trial on count two. Thus, the district court's reaching back into count one to award attorney fees is inconsistent with the remaining judgment. Moreover, the Hutchisons concede that they did not meet the criteria for an award of attorney fees under I.C. § 45–615. However, rather than deciding the issue solely based on this procedural point, *we will address the substantive question of whether the Hutchisons could be awarded attorney fees pursuant to I.C. § 12–120 when the underlying cause of action is a wage claim pursuant to I.C. § 45–617(4).*
>
> . . . .
>
> The Idaho Supreme Court has held that attorney fee awards in suits for wages should be based upon I.C. § 45–615 (then I.C. § 45–605). *Schoonover v. Bonner County,* 113 Idaho 916, 923, 750 P.2d 95, 102 (1988). The Court overturned the decision of the district court which had given an award of attorney fees pursuant to I.C. § 12–121. That Court also declined to award a plaintiff both treble damages and attorney fees on appeal under I.C. § 12–121 when the plaintiff had brought a claim for wages. *Rodwell v. Serendipity, Inc.,* 99 Idaho 894, 895, 591 P.2d 141, 142 (1979). The Supreme Court held that an award of attorney fees in addition to treble damages would constitute an unreasonable windfall to the employee and would punish the employer too harshly. *Id.* Therefore, we

hold that I.C. § 45–615 is the *exclusive* code section under which an employee can recover attorney fees when the employee properly brings a claim for wages and treble damages under I.C. §§ 45–61[5], –617.

*Id.* at 942–43, 950 P.2d at 1281–82 (emphasis added).

Bilow criticizes the *Hutchison* opinion as "judicial legislation," arguing that there is no express provision in the wage claim statutes that states that I.C. § 45–615 is an exclusive source to recover attorney fees. Consequently, he is free to exercise his pre-existing common-law right to sue for breach of contract and seek all the attendant remedies thereto. There are two flaws in this argument. First, where "statutory provisions are silent as to whether the remedies should be cumulative or mutually exclusive," the court is free to apply general rules of statutory construction to ascertain the legislative intent behind the statutes. *Lawless v. Davis,* 98 Idaho 175, 177, 560 P.2d 497, 499 (1977). In *Lawless,* this Court addressed the issue of whether a plaintiff could recover damages under I.C. § 45–606 and have that recovery trebled under I.C. § 45–617(4) (then I.C. § 45–615(4)). The Court stated:

> An obvious ambiguity appears when I.C. § 45–606 and I.C. § 45–615(4) are considered together. The legislature has not indicated whether it intended the remedies to be available cumulatively or alternatively. We therefore are at liberty to consider the practical consequences of both interpretations.

*Id.* at 178, 560 P.2d at 500. The Court further noted that

> [w]hen choosing between alternative constructions, courts should presume that a statute was not enacted to work a hardship or to effect an oppressive result. . . . [A]ny ambiguity in a statute should be resolved in favor of a reasonable operation of the law.

*Id.* at 177, 560 P.2d at 499. The Court concluded that the legislature intended I.C. § 45–606 and I.C. § 45–615(4) to be alternative remedies, noting that cumulative application of the remedies would impose extreme results. *Id.* ("[A]pplying the two statutes

together would give Lawless a recovery equivalent to fourteen times the amount of his withheld wages.").

The practical consequence of determining that I.C. § 45–617(4) and I.C. § 12–120(3) are alternative remedies would be that the demand requirement in I.C. § 45–615 would be pointless. The purpose of imposing a demand requirement for attorney fees in I.C. § 45–615 would be meaningless if it were possible to avoid the requirement by simply seeking attorney fees under I.C. § 12–120(3) based on a breach of contract theory. A "common sense appraisal of what the legislature intended," *id.* at 176, 560 P.2d at 498, leads to the conclusion that I.C. §§ 45–615 and 45–617 are the exclusive code sections under which an employee can recover attorney fees when the employee brings a claim for wages and treble damages. This conclusion is consistent with this Court's opinion in *Schoonover v. Bonner County,* 113 Idaho 916, 750 P.2d 95 (1988) which disapproved an award of attorney fees under I.C. § 12–121 and held: "Attorney fee awards in suits for wages are properly awarded pursuant to I.C. § 45–605 [now I.C. § 45–615]." *Id.* at 923, 750 P.2d at 102.

The argument that enactment of Idaho's wage claim statutes does not bar an employee's right to also recover common law remedies is flawed. It is true that a breach of contract claim is a pre-existing right of action that Bilow pursued. However, he sought in relation to his breach of contract claim a statutory remedy, not a common law remedy. The Court is free to apply rules of statutory construction when an obvious ambiguity appears between two statutory provisions. *Lawless,* 98 Idaho at 178, 560 P.2d at 500. The Court of Appeals correctly analyzed the issue in *Hutchison.* Idaho Code §§ 45–615 and 45–617 are the exclusive code sections under which an employee can recover attorney fees whenever the underlying cause of action is a wage claim pursuant to I.C. § 45–617(4). Bilow's claim for attorney fees pursuant to I.C. § 12–120(3) is denied.

## VII.

### CONCLUSION

The district court's order granting summary judgment to Bilow is affirmed.

TROUT, C.J., JOHNSON and WALTERS, JJ., and MORFITT, J. Pro Tem, concur.